Paul A. Tyrell (Bar No. 193798)
E-mail:     paul.tyrell@procopio.com
Jacob Kozaczuk (Bar No. 294734)
E-mail:     jacob.kozaczuk@procopio.com
PROCOPIO, CORY, HARGREAVES &
   SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Plaintiff Snopes Media Group, Inc.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| SNOPES MEDIA GROUP, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>BARBARA MIKKELSON, an individual; and DOES 1 through 20, inclusive,<br><br>    Defendants. | Case No. 3:21-cv-1730-BAS-DEB<br><br>FIRST AMENDED COMPLAINT FOR:<br><br>(1) VIOLATION CALIFORNIA PENAL CODE SECTION 496 (RECEIPT OF STOLEN FUNDS); AND<br>(2) UNJUST ENRICHMENT<br><br>Dept:    4B (4th Floor)<br>Judge:   Hon. Cynthia A. Bashant<br><br>Complaint filed:  March 20, 2021<br><br>Removed:          October 6, 2021 |
|---|---|

Plaintiff SNOPES MEDIA GROUP, INC., formerly known as Bardav Inc ("Snopes Media Group" or "Plaintiff") alleges as follows:

**SUMMARY OF ACTION**

1.  After selling her ownership interest in Snopes Media Group, Defendant BARBARA MIKKELSON ("B.Mikkelson") extorted, through express threats, additional sums of money legally belonging to Snopes Media Group for her benefit. In addition to the extortion, B.Mikkelson came to be in possession of funds that she

knew or came to know were stolen from Snopes Media Group and has thus been unjustly enriched by the retention of the stolen funds.

## THE PARTIES

2. Plaintiff Snopes Media Group is, and at all times mentioned in this First Amended Complaint (the "Complaint") was, a corporation duly organized and existing under and by virtue of the laws of the State of California, and doing business within the State of California.

3. Plaintiff is informed and believes, and on that basis alleges, that Defendant Barbara Mikkelson ("B.Mikkelson") is an individual who presently resides in Las Vegas, Nevada.

4. The true names and capacities, whether individual, corporate, or otherwise of the defendants named in this Complaint as Does 1 through 20, inclusive, are unknown to Plaintiff. Plaintiff is informed and believes, and on that basis alleges, that each of said fictitiously named defendants is liable to Plaintiff on the causes of action herein alleged and/or asserts some interest, legal or equitable, in the subject matter of this action, and therefore Plaintiff sues said defendants by said fictitious names. Plaintiff will move to amend this Complaint when the true names and capacities of said fictitiously named defendants have been ascertained.

5. B.Mikkelson and Does 1 through 20 are collectively referred to as the "Defendants" herein.

6. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint the Defendants, and each of them, were the agents, servants, employees, and/or alter egos of each of the other co-Defendants, and in doing the things alleged in this Complaint were acting within the scope of their authority as such agent, servant, employee, and/or alter ego, and with the permission and consent of their co-Defendants.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00 and because complete diversity exists between Plaintiff, a business incorporated under the laws of California with its principle place of business in California on the one hand, and Defendant, a citizen of Canada who is domiciled in Nevada on the other.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this

## GENERAL ALLEGATIONS

9. This action involves the operation of, and advertising revenue generated by, the Snopes.com website, which is owned by Snopes Media Group. Snopes Media Group is a California corporation founded in 2003 by then-husband and wife, David Mikkelson ("D.Mikkelson") and B.Mikkelson. Since its formation Snopes Media Group has been the ownership entity for the Snopes.com website, which D.Mikkelson first began as a personal project in as early as 1994. D.Mikkelson and B.Mikkelson were each directors of Snopes Media Group until B.Mikkelson sold her ownership interest in 2016.

**Snopes Media Group's Prior Relationship with Proper Media**

10. Proper Media LLC ("Proper Media") is a member-managed "internet media" company founded in 2015 by Drew Schoentrup ("Schoentrup"), Christopher Richmond ("Richmond"), Tyler Dunn ("Dunn"), Vincent Green ("Green"), and Ryan Miller ("Miller"). Proper Media advertised itself as owning, operating, and representing web properties, working with website "publishers" and "advertising partners."

11. On or about August 11, 2015, Snopes Media Group, under its former name, Bardav Inc, and Proper Media entered into a written one-year contract entitled the General Service Agreement ("GSA"). Under the GSA Proper Media agreed to

provide certain services to Snopes Media Group for the Snopes.com website during the term of the agreement.

12. The GSA had an initial term of 1 year commencing on August 11, 2015, and thereafter reverted to renewable monthly terms until such time it was terminated by either party.

13. Among other tasks, Proper Media contracted to represent Snopes Media Group with respect to advertisement procurement, placement, and management, subject to Snopes Media Group's ultimate discretion.

14. The GSA further provided that Proper Media would compensate Snopes Media Group based on advertising invoicing on a monthly basis.

15. Proper Media was contractually obligated to invoice and collect all advertising revenue for the Snopes.com website.

**The Stock Purchase Agreement**

16. In 2015, D.Mikkelson and B.Mikkelson divorced, resulting in each retaining an independent fifty percent (50%) ownership interest in Snopes Media Group.

17. In April 2016, Schoentrup and Richmond offered to buy B.Mikkelson's ownership interest in Snopes Media Group at a price Schoentrup described as "generous" given that "[they] would be buying a non-controlling stake in the company." Schoentrup informed B.Mikkelson that three other owners of Proper Media would be "cut in for a small percentage" of the purchase of B.Mikkelson's ownership interest.

18. On or about July 1, 2016, pursuant to a written Stock Purchase Agreement (the "SPA"), B.Mikkelson sold her 50% ownership interest in Snopes Media Group to Schoentrup, Richmond, Dunn, Green, and Miller, in the following percentages:[1]

---

[1] The SPA contains a confidentiality provision and therefore Bardav is not attaching a copy to this public document.

| Name | Purchase Percentage | Overall Ownership in Snopes Media Group |
|---|---|---|
| Drew Schoentrup: | 40% | 20% |
| Christopher Richmond: | 40% | 20% |
| Tyler Dunn: | 6.68% | 3.34% |
| Vincent Green: | 6.66% | 3.33% |
| Ryan Miller: | 6.66% | 3.33% |

19. Under the SPA, the shares were sold to, and held by, the above-identified persons in their individual capacity. The SPA makes no mention of any of these parties holding their shares for the "benefit" of Proper Media.

20. Likewise, the SPA does not provide that any of these acquiring individuals, including Schoentrup, would obtain a position on Snopes Media Group's board of directors. The SPA was not accompanied by any corporate resolution appointing Schoentrup or any of the other purchasers to Snopes Media Group's board of directors.

21. Pursuant to the SPA, B.Mikkelson sold her 50% ownership interest in Snopes Media Group . A portion of the purchase price was due at closing (the "Down Payment") and the balance was due in monthly installments pursuant to a promissory note attached as an exhibit to the SPA (the "Promissory Note").

**The Embezzlement of Snopes Media Group's Revenues to Pay for B.Mikkelson's Ownership Interest in Snopes Media Group**

22. In April 2016, prior to the SPA, D.Mikkelson instructed Proper Media to temporarily hold off on disbursing funds into Snopes Media Group's bank account due to a concern regarding unauthorized withdrawals from that account by its then-bookkeeper, B.Mikkelson.

23. On June 2, 2016, B.Mikkelson informed Schoentrup that Snopes Media Group needed a new bookkeeper to replace her after her ownership interest was sold. Schoentrup touted his experience with handling all of Proper Media's books and stated he "would love to take over."

24. After the SPA was entered into in July 2016, Schoentrup took over B.Mikkelson's position as Snopes Media Group's bookkeeper.

25. However, after Schoentrup took over as Snopes Media Group's bookkeeper, Proper Media failed to return the advertising revenues temporarily withheld from Snopes Media Group since April 2016.

26. On information and belief, Schoentrup and Richmond were unable to obtain financing to pay the $1,850,000 due at closing to purchase B.Mikkelson's ownership interest in Snopes Media Group and, as a result, the SPA was amended to allow for delivery of the Down Payment within 60 days after closing.

27. On information and belief, Schoentrup, Richmond, and Dunn used Snopes Media Group's advertising revenues to pay thousands of dollars in interest to B.Mikkelson while they scrambled to secure a loan for the Down Payment.

28. On information and belief, the reason Proper Media did not timely pay Snopes Media Group its April and May 2016 advertising revenue is because the hundreds of thousands of dollars were already diverted from Proper Media's bank account and used in connection with their purchase of Snopes Media Group's shares from B.Mikkelson.

29. On information and belief, Schoentrup, Richmond, and Dunn used Snopes Media Group's advertising revenue to purchase B.Mikkelson's ownership interest—revenue that Proper Media was entrusted with and legally belonged to Snopes Media Group.

30. On information and belief, Schoentrup, Richmond, and Dunn continued to withhold and embezzle Snopes Media Group's advertising revenue in order to make payments to B.Mikkelson under the SPA's Promissory Note—a scheme that continued through 2017.

31. In fact, after Schoentrup took over as Snopes Media Group's bookkeeper, Proper Media never once paid Snopes Media Group its monthly share of advertising revenues within the time required under the GSA. Rather, Proper Media withheld

Snopes Media Group's advertising revenues for months at a time, returning the funds hundreds of days later.

32. Schoentrup, Richmond, Dunn, and Defendants actively concealed their use of Snopes Media Group's advertising revenue from Snopes Media Group.

33. As early as January 2016, and long before Schoentrup assumed the role of Snopes Media Group's bookkeeper, Schoentrup agreed to send an accounting breakdown to D.Mikkelson whenever Proper Media deposited advertising revenue in Snopes Media Group's bank account.

34. Once Schoentrup assumed the role of bookkeeper for Snopes Media Group, he stopped providing invoices altogether, further concealing his and Defendants' improper use of Snopes Media Group's advertising revenues.

35. In September 2016, well after B.Mikkelson entered into the SPA, she approached Schoentrup and demanded additional sums that she contended comprised her outstanding net income. She suggested the parties reach a new agreement to complete their transaction.

36. B.Mikkelson followed up this demand for additional funds with express written threats to disseminate false and defamatory information about D.Mikkelson to the news media if she did not receive the money she was demanding, a threat which B.Mikkelson warned would adversely affect the Snopes brand and website, which in turn could reduce the value of Snopes Media Group's shares.

37. As a result, in October 2016, B.Mikkelson and Schoentrup entered into a confidential settlement agreement (the "Settlement Agreement") to resolve these threats, even though B.Mikkelson knew Schoentrup had no authority to enter into an agreement on behalf of Snopes Media Group or to obligate the company to pay funds to her.

38. On or about March 9, 2017, Snopes Media Group notified Proper Media it was terminating the GSA.

39. Despite holding no ownership interest in Snopes Media Group, Proper Media held itself out as "the beneficial owner of 50% of the shares in [Snopes Media Group]."

40. Presumably based on this false assertion, Proper Media disputed Snopes Media Group's ability to terminate the GSA and improperly attempted to exercise rights of a Snopes Media Group shareholder.

41. Despite no corporate resolution appointing him to Snopes Media Group's board of directors, Schoentrup also held himself out as a Snopes Media Group board member and improperly attempted to exercise rights of a Snopes Media Group director.

42. In connection therewith, Proper Media failed and refused to comply with Snopes Media Group's requests for information, including financial information, and instead held hostage the requested information belonging to Snopes Media Group.

43. Proper Media also continued to withhold Snopes Media Group's advertising revenue and used that revenue for their own purposes, including to make payments to B.Mikkelson under the SPA Promissory Note.

**Continued Embezzlement**

44. On information and belief, in August 2017, Schoentrup approached B.Mikkelson and requested that she consider an early settlement of the Promissory Note combined with 12 months of lower payments so he could refinance debt.

45. B.Mikkelson rejected the proposal and insisted that the entirety of the debt owed to her, including not only the amount under the Promissory Note but also the amount she extorted under the Settlement Agreement, be retired together or the Promissory Note be left unchanged.

46. On October 4, 2017, pursuant to B.Mikkelson's demand, Proper Media, Schoentrup, Richmond, and Dunn entered into series of three secret agreements with B.Mikkelson regarding the early settlement of the Promissory Note and Settlement Agreement.

47. Under the first two of these secret agreements, the Promissory Note would not be retired, but instead would be purchased and assigned to Schoentrup and Richmond at discount on the total amount due. The assignment contract between B.Mikkelson, Richmond and Schoentrup was subsequently found to be an illegal contract and void, a finding that was affirmed by a California state appellate court in *Richmond v. Mikkelson*, No. D076375, 2021 WL 2274888, at *8 (Cal. Ct. App. June 4, 2021).

48. The funds used for the unlawful purchase and assignment of the Promissory Note were paid using advertising revenue unlawfully withheld from Snopes Media Group.

49. In the third agreement, made as partial consideration for the former two agreements, B.Mikkelson, Proper Media, Schoentrup, Richmond, and Dunn each signed an undisclosed release (the "Release"), releasing them from their payment obligations under the extortion-related Settlement Agreement in exchange for making an early payment to B.Mikkelson in the amount of $159,008.60.

50. On information and belief, the Release did not release the parties from the non-disparagement clause in the Settlement Agreement in order to keep B.Mikkelson from disseminating the false and defamatory information she threatened to release during the first round of extortion.

51. The $159,008.60 payment was for the entire undiscounted outstanding principal debt owed by Dunn, Richmond, and Proper Media to B.Mikkelson pursuant to the Settlement Agreement, the payment of which was a requirement for obtaining an assignment of the Promissory Note at a discount.

52. Although Proper Media, Schoentrup, Richmond, and Dunn each agreed to pay the entire principal amount owed under their settlement agreement with B.Mikkelson years in advance and without receiving any discount, they did not use any of their own money to pay her. Instead they paid their new obligation under the

1  Release solely with Snopes Media Group's advertising revenues that had been
2  unlawfully withheld from Snopes Media Group.

3      53.  Although Snopes Media Group's advertising revenues were used to pay
4  for the Release, the Release was not disclosed to Snopes Media Group. Rather, Proper
5  Media, Schoentrup, Richmond, Dunn, and B.Mikkelson concealed the Release
6  transaction from Snopes Media Group.

7      54.  On or about April 13, 2018, B.Mikkelson produced 1,480 documents
8  pursuant to discovery in related litigation. Information exposing the Release and
9  B.Mikkelson's continued extortion was first discovered among these produced
10 documents several months after the production.

11     55.  After significant delay, Proper Media provided "invoices" for the
12 withheld advertising revenues, including a $159,008.60 withholding for "Barbara
13 Mikkelson Settlement Payment."

14     56.  On information and belief, Defendants knew that the funds that were used
15 to pay for the Release were misappropriated, embezzled, stolen, or otherwise obtained
16 from Snopes Media Group in a manner constituting theft. Among other things,
17 developments in the related litigation between Snopes Media Group and Proper Media,
18 et al., had been extensively reported in the press, including Snopes Media Group's
19 contention that Proper Media and its owners were withholding funds that belonged to
20 Snopes Media Group; B.Mikkelson's name appears in many of those reports, and it is
21 extremely likely that she was familiar with the litigation, reports about it and the
22 contentions therein.

23     57.  Defendants have refused to return the stolen funds despite knowing that
24 the funds were stolen and after being notified by Snopes Media Group of its contention
25 that they were in possession of stolen funds.

26     58.  Due to the state of Emergency related to the COVID-19 pandemic, the
27 California Judicial Council adopted Emergency Rule 9, which tolled the statute of
28 limitations during the state of emergency.

59. Effective as of May 29, 2020, an amendment to Emergency Rule 9 tolls civil causes of action in California from April 6, 2020 to October 1, 2020 if the statute of limitations for the cause of action exceeds 180 days.

60. Emergency Rule 9 applies to this case, which was originally filed in California state court, and tolled the statute of limitations on the claims herein for a period of 178 days.

## FIRST CAUSE OF ACTION

### (Violation of California Penal Code section 496 against Defendants)

61. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

62. Defendants received money that was misappropriated, embezzled, and stolen from Snopes Media Group, including without limitation, advertising revenues associated with the Snopes.com website. The money was stolen or obtained in a manner constituting theft or extortion. It was also paid in connection with an unlawful transaction.

63. On information and belief, Defendants knew the money was misappropriated, embezzled, stolen, or otherwise obtained in a manner constituting theft or extortion, but nonetheless received, concealed, and withheld the money from Snopes Media Group, and aided in obtaining, concealing, and withholding the money in violation of California Penal Code section 496. Defendants also knew that their receipt of such money was in connection with an unlawful transaction. Defendants have refused to return the stolen funds despite knowing that the funds were stolen and after being notified by Snopes Media Group of its contention that they were in possession of stolen funds.

64. As a result of Defendants' acts and conduct as alleged above and below, Snopes Media Group suffered and will continue to suffer damages, in an amount to be proved at trial.

65. Pursuant to California Penal Code section 496(c), which provides that any person who has been injured by a violation of Penal Code section 496(a) "may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees", Snopes Media Group is entitled to three times the amount of its actual damages, costs of suit, and attorneys' fees, in an amount to be proved at trial.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

66. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

67. Defendants, and each of them, have been unjustly enriched by their receipt of monies that were misappropriated, embezzled, or stolen, from Snopes Media Group, and in connection with unlawful transactions.

68. On information and belief, Defendants had knowledge that the payments received were embezzled from Snopes Media Group. Defendants also had knowledge that the receipt of such funds was in connection with an unlawful transaction.

69. Snopes Media Group was detrimentally affected by the use of its funds to pay B.Mikkelson for the SPA, Settlement Agreement, Promissory Note, and Release, and otherwise, none of which benefited Snopes Media Group.

70. Defendants retention of the payments at the expense of Snopes Media Group would be unjust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For actual damages according to proof;
2. For special damages according to proof;
3. For consequential damages according to proof;
4. For treble damages according to proof;
5. For restitution and/or disgorgement of ill-gotten gains;

6. Imposition of a constructive trust on Defendants, as constructive trustees, for the benefit of Snopes Media Group, with respect to any assets or property acquired with funds withheld, owed, and/or belonging to Snopes Media Group;

7. That the Court impose an equitable lien on Defendants, and each of them, to prevent Defendants from retaining and enjoying the benefits of any assets or property acquired with funds withheld, owed, and/or belonging to Snopes Media Group;

8. For interest at the maximum legally permissible rate;

9. For equitable relief;

10. For attorneys' fees;

11. For costs of suit incurred herein; and

12. For such other and further relief as the Court deems just and proper.

DATED: November 8, 2021          PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: */s/Paul A. Tyrell*
Paul A. Tyrell
Attorneys for Plaintiff Snopes Media Group, Inc.